Good morning ladies and gentlemen. Our first case for this morning is Wesbrook against Ulrich. Mr. Pines. Good morning. May it please the court. I'm Lester Pines. I represent the appellant Stephen Wesbrook. The primary issue in this case is whether this court should continue the holding in the Preston case. Preston versus Wisconsin Health Fund. We have asked the court to overrule Preston. And we've done that. Could I just ask you two things and maybe there are other questions. First, what we say about the content of any particular state's law isn't the law. I mean we are reporting it as we understand the state to be doing it. And there are cases since the Preston decision out of Wisconsin that seem to have no problem with our law. But perhaps more importantly, even if Preston weren't there, the tortious interference claim couldn't go forward if the statements are truthful. As I understand, completely to one side, Preston, as I understand Wisconsin law. So why don't you talk a little bit about exactly what Wisconsin law says as opposed to Preston. All right. And let me preface that by saying that there are no Wisconsin cases that have followed Preston. Have any disagreed with it? I beg your pardon? Have any disagreed with it? None have disagreed with it, but the Briesenmeister case was decided in 2006 after the Preston case was decided. And paid no attention to the two additional factors that the Preston case imposed on an employee who is making a claim of tortious interference with contract. So that's the first, that I think is an important issue. What about the McKenzie case, which is from the Wisconsin Court of Appeals, it's before Preston, that says the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference. That's just, that's a Wisconsin case. That's true. And in this case, the manner in which this case was argued was focused on the claims that defamatory information was submitted by the defendants. And those pieces of information, at a minimum, are pieces of information which were false. Well, but that's actually not what the district court found. I mean, and I guess what you're admitting, really, is that the question whether something is truthful is an element that overlaps between these two causes of action. Certainly truth would be a defense to defamation, but truth is also, according to the case that I was just citing to you, and others, something that would preclude a tortious interference. Well, truthful information, that is, the issue in this case was that information had been submitted. It was contested by Mr. Westbrook. The same information that was submitted in the summary judgment, we contend, had been submitted before to the Board of Directors by Ulrich. It was resubmitted, again, along with additional information that was false information that tipped the scales. Could you review what information in particular, I just want to make sure my list is correct, that you contend was false? Well, there were at least two critical pieces of information that were false. One, that there were complaints that had been filed against Mr. Westbrook, Dr. Westbrook. That is false. What do you mean, is filing that technical? They made the complaint, right? Well, we don't know that. That is, there were no complaints that were made to the Human Resources Department. There were people who said things, but no one ever filed a complaint. My understanding was verbally saying something wasn't the same as being filed. Verbally saying something is not the same as being filed. Well, it certainly is for some purposes. We've had cases in the employment discrimination area that have dealt with precisely that issue, whether an oral complaint will do, and the answer is yes. Well, in this case, there is a procedure that the Marshfield Clinic had with regard to filing complaints. No one had ever alleged until the Belongia memo, which was used by Ulrich to influence the Board of Directors, no one had ever alleged that any complaint had ever been filed about Stephen Westbrook. And, in fact, these very same issues had been brought up in 2010, had been debunked in 2010, had been brought up again in 2011. Excuse me, counsel. On the 2010, that was, am I correct that that was when the Board chose not to fire you? That is correct. And the vote was what? I'm not certain if the record contains it, but it was a close vote. It was nine to eight, correct? I believe that that's correct. And if I've seen it, it's probably in the record, okay? Okay. And your argument seems to be that because he survived that vote, it's almost as if he'd been acquitted. It's sort of like a double jeopardy clause, that all of that is erased at that point. Is that right? Well, the Board chose after hearing these kinds of issues, after the scientist attrition report had been prepared and had debunked the notion that Stephen Westbrook had driven people out of the Marshfield Clinic Research Foundation, the Board voted not to discharge him. This is within a politically charged atmosphere. Is the theory that that vote then just wiped the slate clean? Well, he wasn't discharged. He continued to function. You're not really answering my question. It's my position. What could the Board reasonably say later, these are the straws that break this camel's back? Well, in 2011, in the fall of 2011, again, the same information was rehashed before the Board, and the Board at that point said, well, you should work, said to Ulrich, you should work out a performance improvement plan with VITA-A. Can we circle back to Judge Wood's question? Yes. We got one, which seems to be the difference between oral complaints and written complaints, right? Yes. That you say this case turns on. Anything else that was false? That Stephen Westbrook had coerced individuals into. As opposed to intimidating. As opposed to intimidating, and of course. Can we talk about your use of the word coerce? Because at least the defense has told us that in your proposed findings of fact, you accused Dr. Ulrich of coercion. Did you mean the same way you mean it in your briefs today? Coercion has a specific meaning. When we use the word coercion with regard to Dr. Ulrich, Dr. Ulrich engaged in a variety of threatening behaviors. Physically threatening? Not physically threatening behaviors, but Dr. Ulrich had power that Dr. Westbrook did not. Really? I mean, you know, you're using dictionaries, and actual people, when they're talking about things, use words in ways that could create a synonym. One of the definitions of coercion is intimidation and vice versa. And I don't see how you get all the way from overlapping meanings to falsehood. I can certainly see sloppiness. I can see other potential interpretations. But when somebody uses a word that is a well-recognized synonym of another word, even though shades of meaning will differ, I don't disagree with that. I can't believe that that makes it false. Right. Well, I want to take a step. We could just take a step back for a moment to put this into context. That is, the reason that this case, that we were forced in this case to focus on things that might be defamatory is because the Preston case required us to do that. Why did you file in federal court then? You were suing in-state defendants. If you had filed in the state courts of Wisconsin, they could not have removed. You would have been squarely in state court, and you could have told them that those people in the Seventh Circuit don't know what they're talking about, never mind Preston, go straight to tortious interference law, and you wouldn't have had this issue. Well, the problem, Your Honor, is that there's a reason that diversity jurisdiction exists, and one of the reasons that diversity jurisdiction exists is to allow a citizen of another state, which Dr. Westbrook was at the time this was filed. I'm pretty familiar with the reasons for diversity jurisdiction, Counsel, but you're the one who is unhappy with our precedent, and as Chief Judge Wood has pointed out, you're the one who chose this forum. That's true. It's an unusual position to be in, particularly since there is no indication that I've seen that the Wisconsin courts are unhappy with Preston. They might agree, they might disagree, but they've simply not addressed it. That's true, but the fact is that subsequent Wisconsin state court cases have not applied Preston, and a litigant who comes into federal court under diversity jurisdiction has the right to have state law applied, and currently, as it exists, a litigant who comes into a federal court in diversity jurisdiction in Wisconsin does not have the right to have state law applied. That's not true at all. I mean, I just don't know where you get that. It is the most ordinary thing for us to have a diversity case out of any state, and if there is an earlier interpretation of state law that we have made, that the state authoritatively later says, actually, that doesn't reflect our law. I can remember one instance of a case that Judge Kaney and I were on, where the Indiana Supreme Court had to do with an interpretation of insurance policy, and what did the word accident mean, and the Indiana Supreme Court just said, Seventh Circuit got it wrong. We were like, okay, you know, we will apply what state law is the next time around. That's our job, as you say, but if you think that there is something that's up in the air, like Preston, that the Wisconsin courts have neither agreed with nor disagreed with, you need to go to the jurisdiction that's got the authority to change it. Well, the fact is, we asked Judge Connolly to distinguish this case from Preston. Well, that's a different matter altogether, and actually gets back to my first question, which is, I think this is much ado about nothing, since Wisconsin cases have said directly for a tortious interference case, that truth is a defense to a claim with intentional interference with contract. So it seems to me we could just drill right down to whether truth is, in fact, demonstrated here. The district court used the term truth and substantially truthful. It seems like a more productive way to go. The elements in Wisconsin which should have been applied here require that the fifth element, which was really the element that was being addressed in this case, require that the defendant was not justified or privileged to interfere with the contract that is alleged to have been interfered with. And what Wisconsin law has said is that the question that has to be asked is whether there was improper motive or malice toward the plaintiff. So your contention, counsel, is that if one employee makes truthful statements about another to a boss or a board of directors, that's a tort if their motive is wrongful. I'm not going that far, Your Honor. I'm saying in the totality of the evidence in this case, where we have an employee who had excellent evaluations where all of these things. Now there's a feud. Would you please answer my question? Because I don't see how you're not saying that you seem to be saying that under Wisconsin law, one employee commits a tort by providing truthful information to CEO or board of directors if their motive is selfish in some way or malicious. Well, the truthful information that was provided here was that people had made complaints. Let's separate the question of motive and truth for a moment, okay? Because this goes, I hope, back to Chief Judge Wood's question about Wisconsin law. Are you saying under Wisconsin law you believe it's a tort for one employee to provide truthful information to another if there's something wrong with their motive? Yes. Based on what authority? Based on the Briesenmeister case. The case does say that true statements are not actionable, all right? Which makes it a strange case for you to rely on, I have to say. It doesn't really help you, does it? I thought it went directly against you, to be honest. It helps in that it explains how one does the analysis under Wisconsin law. And it is very clear that the conditional privilege for providing information, which is what the fifth element in Wisconsin law is about, is lost if the defendant acted from ill will or improper motive. Your answer to Judge Hamill's question was yes. The answer is yes, but I'm not conceding that we have conceded that the underlying statements are true. We have conceded that the underlying statements by other employees were made. Statements versus complaints. Well, we're also saying that we have only conceded that the underlying statements were made, not that they were true statements. The determination of whether there was truth or not in those statements made by the third-party employees has not been determined and has not been conceded. But they were made, though. They made complaints. And when we look at the totality of the evidence here, what we're saying is that complaints that were made, that information about complaints having been made, not filed, but made, was transmitted. There is truth to the fact that such statements were made. But in the totality of this, that we allege that Ulrich, along with Belongia, reiterated those statements over and over, ignoring other information that showed that Steve Westbrook's performance was outstanding, reiterated that over and over in an attempt to convince the decision-maker that they should discharge him. And there was an improper motive, which we've laid out substantially in our brief, a very substantial improper motive in doing that, because it was retaliatory for Westbrook's behavior in assisting other board members in trying to stop a reorganization, which they ultimately did and kept Ulrich from a substantially better position that he had under the current organization. So it isn't… You said earlier, if you, pardon me, if you said earlier this is politically charged. What do you mean politically charged? There was a dispute, which is laid out pretty well in the briefs, about the reorganization of the Marshfield Clinic from a physician-owned… Well, I understand. When you said politically, you don't mean partisan politics? Not partisan politics, but internal politics within the employment center. I understand. Yeah. And so that's where we think that this case lies, is that the examination of the totality of the evidence and the motive of Ulrich and Belongia is where the court should have focused. And that, of course, getting back to the issue of Preston, Preston then forced the court, rather than focusing on ill will or improper motive, forced the court to focus on whether an independent tort had been committed of defamation or fraud, which is not what Wisconsin law is. And so the reason we've come to the court saying Preston should be overruled is, is that the independent tort requirement was added on, and in Preston, added on in a paragraph as a policy decision, which really has no place in Wisconsin law. It just doesn't make any sense. Well, if you'd like to save a minute for your rebuttal, this would be the time to do it. I will do that. Thank you, Your Honor. Mr. Poore. May it please the court. After page after page of talking about bad motives, we finally get to what this case is really all about. And it's a simple rule. It's based on Wisconsin law. We don't have to address Preston. And it's the simple rule that making a truthful statement in the workplace is not a grounds for a tortious interference claim. It's privileged. Now, under the Breezemeister case, which sets out these five elements of the tortious interference with contract claim in Wisconsin, obviously there are other cases as well, but everybody, I assume, is agreeing that there's a contract. There was interference in the sense of the, I don't see that as at stake. Intentional, causal connection. So aren't we focusing on whether what was said was justified or privileged? Exactly, Your Honor. A truthful statement under cases like Lieb, which is really the original case, which adopts the restatement section 772, which states that a truthful statement, in particular in the workplace here, is privileged. Absolutely. Conditional. Doesn't matter whether there's a motive that one employee does not like another employee for whatever reason, political or you name it. It's an absolute privilege. And that's when we talk about interference with contract, they're the overall number of general factors that you see in the restatement 766. That's when you look at motive and the like. But when the drafters of the restatement put together as a whole, they included 772, which says flat out that truthful statements are privileged. And that's what Lieb, that's the holding of Lieb and McKenzie, and no Wisconsin court has ever described this privilege as conditional. Let me ask you this. I, for myself anyway, have identified four statements that are allegedly, well, that are the focus here, allegedly defamatory or whatever you want to say. One, this use of the word coercion in the November 30, 2011 letter. Two, this idea of filing complaints as opposed to lodging them or in some other fashion orally sending them in. Third, statements about failure to comply with the performance improvement plan, and I guess one was never actually formed, or at least allegedly, one was never actually put in place. And finally, this letter from Congressman Laird talking about talking to 40 people who were criticizing Mr. Westbrook and so on. And the district court, he doesn't actually say they're all true. He uses the word substantially truthful, and I'm wondering if that's like a little bit pregnant or something. What's the difference between truthful and substantially truthful? Well, if it comes down to what I would refer to hair splitting on things, what's the definition of intimidation versus coercion? If it's substantially true in the sense that the essence of it is the same, and I think there's no scientific hard line, but you recognize when it's there that it's substantially true, then that's what the privilege encompasses. Otherwise, you do invite, if it has to be some kind of technical definition, then you do invite what we've got here is arguments about, well, I did intimidate, and he concedes that he intimidated employees, but I really didn't coerce them. We maintain that if the contest is between Dr. Westbrook's hair splitting and the dictionary, the dictionary wins because the essence of the definition is the same. And the evidence, the unrebutted evidence here, and we presented 19 affidavits from former and current employees all to show why there were no untrue statements. And it was Dr. Westbrook's burden at that point on summary judgment to do two things. One, identify what he thought were any untrue statements and then come forward with evidence of his own to show why those statements were untrue. And that's what he did in his brief in summary judgment. He identified the four you just mentioned. You can group them, the two Belongia statements and the two in the Oldbrook chronology. Those were the four that the district court focused on. Those were the basis of the district court's opinion. In his brief before this court, Dr. Westbrook does the same thing. Pages 48, 58 of his brief here, same four statements. So when you look at the evidence of those, for instance, of the intimidation versus coercion, the evidence bears that out that coercion by any other name. One employee broke down crying, recounting how he was treated by Dr. Westbrook at a meeting. Another employee who was at that same... Sanjay Shukla, yeah. Yeah, Sanjay Shukla. She reported that she was at that same meeting and described the episode as one in which her colleague was, quote, whipped like a dog. Another employee reported having heart palpitations and described waking up in the night because of how she was treated by Dr. Westbrook. Now, again, I mean, coercion by any other name is coercion. So, I mean, that cannot be an untrue statement. And when we get to the other, what I would describe as hair-splitting about whether there's... the complaints were filed, well, Dr. Westbrook claims that that must mean there were written formal complaints. Well, we can all read the letter. It doesn't say that. He doesn't say that there were formal written complaints. He just says that there were people complaining to the Human Resources Department about Dr. Westbrook, and that's what the unrefuted evidence shows time and time again. I believe there's at least five persons who went to HR and said, we're complaining about Dr. Westbrook. So those are all substantially true, and he didn't come back with anything remotely to refute that. And when we get to the Ulrich chronology, here Dr. Westbrook is trying to create an untrue statement out of something that was never said. He claims that the chronology states that he did not comply with a performance improvement plan. Here again, we can all read the chronology, and that's not what it says. What the chronology says, and what it recounts, is all the ways that Dr. Westbrook was dragging his feet and resisting the very creation of a performance improvement plan, and even details unrefuted evidence from Paula Pretzel that she was intimidated from doing her job and trying to develop this plan in the first place. So there's no, and even if we were going to quibble about anything, about what was said, that's absolutely substantially true. Finally, we have the Laird letter, and here the supposed false statement is that Secretary Laird could not have talked to 40 individuals. Dr. Westbrook does not come forward with evidence of his own on summary judgment to try to refute that. And whatever the exact number was, it's essentially true that people over and over again, people came forward to complain about Dr. Westbrook. I mean, that's in those 19 affidavits that we filed. So the district court correctly concluded that when you look at these four statements, and that's all there is, in summary judgment, in his opening brief here, those are the four statements. That's all I found. Mr. Poore? Go ahead. Wisconsin has a presumption of at-will employment, doesn't it? I believe it does. We did not address any presumption in our brief. I guess the concern I have is about this role of motive. Because given the evidence of the long-term feud between Dr. Ulrich and Dr. Westbrook and their various allies on the future of the clinic, it's easy for me to extrapolate and imagine that in many, many employment situations, somebody who loses an internal power struggle can wind up pointing to bad motive on the other side and create a genuine issue of material fact if motive is material. Would you agree with that? That's exactly right, Your Honor. And I think that was what the Preston case was getting at, is that if you have an at-will employment situation, and Dr. Westbrook has never come up with any evidence that he had a contract. I mean, there's no contract here. He claims that he's trying to tease out some kind of for-cause contract because there was this process with the Board of Directors. That was an internal procedure. There's no evidence that he was a for-cause contract employee. But if you have an at-will situation, and all you have to do is say, I think my colleague was after me for whatever reason in the world, you basically erode the whole concept of at-will employment at that point because anybody can come up with a bad motive about somebody doing something. Well, the problem is there isn't in a number of other states as well, and at least as I read the law, it generally tries to avoid having motive be a part of that analysis when you're talking about employees suing each other about one's discharge. Exactly. I think that certainly underlies the Preston case, and it really is, I think, part of, it fits very well with why the restatement 772 is written the way it is, and that's why the Lieb case came out the way it did in reliance upon that. On this record, though, if motive were relevant, would you agree that we have a disputed issue given all of the evidence of this feud between the two? Well, it depends upon what motive he's talking about, whether it's a motive for political or ill will towards Dr. Westbrook. Well, the district court said, yeah, you could find some sort of, there's debate about what the motives were. Exactly. There's a debatable motive here. Yes, that's what I just want to understand because I think that does make, I sometimes talked about genuine issues of material law, and I think the genuine issue of material law that we're debating here, in essence, is the role of motive here. So our position would be, even assuming that there is an issue of fact about motive, it's not genuine or material, it's not material to the outcome of this case, and that's what the district court found. So following up on Preston, does it matter to this case? I guess, I mean, suppose we indulge the assumption that this court went too far in saying that you actually have to have a fully mature independent tort going on. Would that have any impact on this case? It would not because Preston is an alternative ground to affirm here. We think it's correctly decided. For all the reasons we stated in our brief, Dr. Westbrook has not come close to satisfying the compelling standard, compelling reasons standard for overruling Preston, but actually Preston can be put on the side for the purposes of this case because it can be, the district court can be affirmed based on cases like Leib and McKenzie and the basic restatement 772 that truthful statements in the workplace are absolutely privileged. Even if ill-motivated, to pick up on Judge Hamilton's point. Yeah, even if there is some kind of bad motive that somebody can tease out of something, but in terms of Preston, it was correctly decided. There's no compelling reason to overturn it, but to affirm the district court, it's not essential. Okay. So in conclusion, we would just go back to the fundamental here that for alleged untruthful statements, the district court correctly found there was no evidence brought forward by Dr. Westbrook to show that any of them were untrue or substantially untrue. And for that reason, the district court should be affirmed. All right. Thank you very much. Thank you. You have about a minute, Mr. Kines. Five minutes? One minute. Oh, one minute. It's supposed to be a rebuttal time. I did reserve five minutes, but I'm sure that I used four of them in my original argument. So I want to say this is substantially truthful is not a determination that something's true. A jury should have been allowed to determine whether there was truth or falsity. That's number one. Number two, the law in Wisconsin is this, to determine whether conduct is justified or privileged, the trier of fact must weigh all the circumstances. The factors to be considered include nature, type, duration, and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether – just let's stick with that. There is a huge amount of evidence in this case about self-interest. There's a huge amount of evidence about motive on Ulrich's part to retaliate against Westbrook for Westbrook doing his job and bringing to the board issues with regard to potential fraud, issues with regard to the way that fiduciary duty should be carried out, and so forth. That is very well established in this record. And a jury should have been allowed to determine whether there was improper motive. Secondly, and finally, the – Dr. Westbrook was not confronted in the employment matter with these affidavits. The affidavits were brought in the summary judgment motion. When we look at what Dr. Viaday said and what we put in from Dr. Viaday, in response to those affidavits, those were contested and not conceded as being truthful statements. And so this is a matter that should have gone to a jury, and it has very significant implications for employees who assist directors in carrying out their fiduciary duties. They should not be retaliated against. All right. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.